Michael A. Sirignano, Esq.
Frank P. Tiscione, Esq.
Ashley N. Prinz, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Liberty Mutual Insurance Company,
Liberty Mutual Fire Insurance Company, Liberty Insurance
Corporation, The First Liberty Insurance Corporation, LM
Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance
Company, Liberty County Mutual Insurance Company, LM
Property and Casualty Insurance Company, Safeco Company
of Indiana, and American States Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY INSURANCE CORPORATION, THE FIRST LIBERTY INSURANCE CORPORATION, LM INSURANCE CORPORATION, LIBERTY MUTUAL MID-ATLANTIC INSURANCE COMPANY, LIBERTY COUNTY MUTUAL INSURANCE COMPANY, LM PROPERTY and CASUALTY INSURANCE COMPANY, SAFECO COMPANY OF INDIANA, and AMERICAN STATES INSURANCE COMPANY, | Docket No.:_____ (     )<br><br>**Plaintiffs Demand a Trial by Jury** |

Plaintiffs,

-against-

DIANA VAVIKOVA, D.C., STAR CHIROPRACTIC, P.C.,
D.V. CHIROPRACTIC CARE, P.C. d/b/a 21 CENTURY
CHIROPRACTIC, P.C., and JOHN DOE DEFENDANTS
 "1" – "10",

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>VERIFIED COMPLAINT</u>

Plaintiffs, Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company,

Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation,

Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company (collectively, "Liberty Mutual" or "Plaintiffs"), as and for their Complaint against Defendants, hereby allege as follows:

### NATURE OF THE ACTION

1.       This action seeks to recover more than $236,000.00 that Defendants wrongfully obtained from Liberty Mutual by submitting, or causing to be submitted, hundreds of fraudulent "No-Fault" insurance charges relating to medically unnecessary, illusory, or otherwise non-reimbursable healthcare services, including bogus and useless diagnostic ultrasounds (the "Fraudulent Services") that Defendants allegedly rendered to New York automobile accident victims covered by Liberty Mutual insurance policies ("Insureds").

2.       In addition to recovering the monies wrongly stolen from it, Liberty Mutual seeks a declaration that it is not legally obligated to pay reimbursement of more than $484,000.00 in pending No-Fault insurance claims submitted by or on behalf of D.V. Chiropractic Care, P.C. d/b/a 21 Century Chiropractic Care, P.C. ("21 Century Chiropractic") and Star Chiropractic, P.C. ("Star Chiropractic") (collectively, the "PC Defendants") because:

> (i)      the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;
>
> (ii)     the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual; and
>
> (iii)    the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of laypersons not licensed to render healthcare services and through the use of illegal kickback arrangements.

3.       Defendants fall into the following categories:

(i)     Defendant Diana Vavikova, D.C. ("Vavikova") is chiropractior and the nominal owner of the PC Defendants, who purportedly read and interpreted the bogus and useless musculoskeletal diagnostic ultrasounds;

(ii)    Defendant 21 Century Chiropractic is a transient healthcare professional corporation that allegedly performed the Fraudulent Services at various No-Fault "clinics" and billed Liberty Mutual for those services;

(iii)   Defendant Star Chiropractic is a transient healthcare professional corporation that allegedly performed the Fraudulent Services at various No-Fault "clinics" and billed Liberty Mutual for those services; and

(iv)    John Doe Defendants "1" - "10" are individuals and/or entities, presently unidentifiable, who participated in the fraudulent scheme against Liberty Mutual by assisting with the operation of the PC Defendants, the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the PC Defendants, and spearheading the pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

4.      Defendants never had any right to bill for or to collect No-Fault insurance benefits for the Fraudulent Services because, at all relevant times, they knew:

(i)     the Fraudulent Services were medically unnecessary, and were ordered and performed pursuant to a fraudulent pre-determined treatment protocol that served to maximize the charges that Defendants could submit to Liberty Mutual, rather than to legitimately treat or otherwise benefit the Insureds;

(ii)    the billing codes used for the Fraudulent Services misrepresented and/or exaggerated the level and type of services in order to inflate and/or unbundle the charges submitted to Liberty Mutual; and

(iii)   the Fraudulent Services were provided pursuant to improper financial and referral arrangements that enriched Defendants and others.

5.      As such, the Defendants are not and have never been eligible to be compensated for the Fraudulent Services that they submitted, or caused to be submitted, to Liberty Mutual through the PC Defendants.

6.      The charts annexed hereto as Exhibits "1" and "2" set forth the fraudulent claims identified to-date that the Defendants submitted or caused to be submitted to Liberty Mutual.

7. Defendants' fraudulent scheme began in 2019 and continues uninterrupted through the present.

8. As a result of Defendants' conduct, Liberty Mutual has incurred damages of more than $236,000.00 and faces more than $484,000.00 in additional pending, fraudulent billing by the PC Defendants for the Fraudulent Services.

## THE PARTIES

### I. Plaintiffs

9. Plaintiffs Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are Massachusetts corporations with their principal place of business in Boston, Massachusetts. Liberty Mutual Insurance Company and Liberty Mutual Mid-Atlantic Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

10. Plaintiffs Liberty Insurance Corporation, The First Liberty Insurance Corporation, and LM Insurance Corporation are Illinois corporations with their principal place of business in Boston, Massachusetts. Liberty Insurance Corporation, The First Liberty Insurance Corporation, and LM Insurance Corporation are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

11. Plaintiff Liberty Mutual Fire Insurance Company is a Wisconsin corporation with its principal place of business in Boston, Massachusetts. Liberty Mutual Fire Insurance Company is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

12. Plaintiff Liberty County Mutual Insurance Company is a Texas corporation with its principal place of business in Boston, Massachusetts. Liberty County Mutual Insurance Company

is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

13.    Plaintiffs LM Property and Casualty Insurance Company, Safeco Company of Indiana and American States Insurance Company are Indiana corporations with their principal place of business in Boston, Massachusetts. LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company are authorized to conduct business and to issue policies of automobile insurance in the State of New York.

**II.    Defendants**

14.    Defendant Vavikova resides in and is a citizen of New York. Vavikova has been licensed as a doctor of chiropractic medicine in New York since on or about February 5, 1999 and serves as the nominal owner of the PC Defendants. Vavikova purports to read and interpret all diagnostic ultrasounds on behalf of the PC Defendants. Beginning in 2019, Vavikova used the PC Defendants as vehicles to submit fraudulent billing to Liberty Mutual and other insurers.

15.    Vavikova is no stranger to no-fault insurance fraud schemes. In fact, Vavikova was named as a defendant in a no-fault insurance fraud lawsuit alleging, among other things, that Vavikova provided unnecessary healthcare services pursuant to a pre-determined treatment protocol without regard to genuine patient care. See State Farm Mutual Automobile Ins. Co., et al. v. Modern Chiropractic, P.C., et al, 19-cv-05895 (E.D.N.Y. 2019).

16.    Furthermore, Vavikova was named as a defendant in another no-fault insurance fraud lawsuit, alleging, among other things, that Vavikova sold her chiropractic license to unlicensed laypersons and entities and permitted them to illegally operate and control a chiropractic professional corporation she had previously incorporated, without ever practicing or

personally treating patients. See Gov't Employees Ins. Co. et al., v. Trinity Medicine, P.C. et al., 20-cv-03080 (E.D.N.Y. 2020).

17.     Defendant 21 Century Chiropractic is a New York professional corporation with its principal place of business in New York. 21 Century Chiropractic was incorporated in New York on or about October 14, 2016, and purports to be owned and controlled by Vavikova. 21 Century Chiropractic has been used by Vavikova and John Doe Defendants "1" – "10" to submit fraudulent billing to Liberty Mutual and other insures.

18.     Defendant Star Chiropractic is a New York professional corporation with its principal place of business in New York. Star Chiropractic was incorporated in New York on or about December 30, 2020, and purports to be owned and controlled by Vavikova. Star Chiropractic has been used by Vavikova and John Doe Defendants "1" – "10" to submit fraudulent billing to Liberty Mutual and other insurers.

19.     Upon information and belief, John Doe Defendants "1" – "10" reside in and are citizens of New York. John Doe Defendants "1" – "10" are unlicensed, non-professional individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, assisting Vavikova with the operation of the PC Defendants and the provision of medically unnecessary services, engaging in illegal financial and kickback arrangements to obtain patient referrals for the PC Defendants, and employing pre-determined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

21.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331, over claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

22.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of the No-Fault Laws and Licensing Requirements

24.      Liberty Mutual underwrites automobile insurance in New York.

25.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively, the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

26.     No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services.

27.     An Insured can assign his or her right to No-Fault Benefits to the provider of healthcare services in exchange for those services.

28.    Pursuant to an executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service," or more commonly, as an "NF-3"). Alternatively, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

29.    Under the No-Fault Laws, healthcare providers are not eligible to bill for or collect No-Fault Benefits if they fail to meet any New York State or local licensing requirement necessary to perform the underlying services.

30.    Even more, the No-Fault Laws make clear that healthcare service providers are not eligible to receive No-Fault Benefits if they are privy to improper financial relationships associated with their patient referrals, conduct which is prohibited by, inter alia the New York Education Law.

31.    Specifically, New York law prohibits licensed healthcare service providers from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

32.    New York law also prohibits unlicensed persons not authorized to practice a profession, from practicing the profession and from sharing in the fees for the professional services. See e.g., New York Education Law §§ 6512, 6530(11), and (19).

33.    Pursuant to 8 N.Y.C.R.R. § 29.1(b)(3), a licensee is precluded from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

34.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis added).

35.     Medical professional entities incorporated in New York must both be owned by a licensed professional who is: (i) authorized by law to practice in New York; and (ii) actually engaged in the practice of medicine in such corporation. N.Y. Bus. Corp. Law §1507.

36.     In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exemptions not applicable in this case, derive economic benefit from healthcare professional services.

37.     Unlicensed individuals may <u>not</u>: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

38.     New York law also prohibits anyone from engaging in for profit, any business or service, which in whole or in part, includes the referring or recommending of persons to a physician, hospital, health related facility, or dispensary for any form of medical care or treatment. <u>See</u>, New York Public Health Law §4501. Similarly, no facility delivering healthcare services shall in any manner split fees with a medical referral service. <u>See</u>, New York Public Health Law §2811.

39.     Therefore, under the New York No-Fault Laws, a healthcare service provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments rendered, or if it allows unlicensed laypersons to share in the fees for the professional services.

40.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313 320, (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice medicine in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

41.     Pursuant to the No-Fault Laws, only healthcare providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than patients or their healthcare providers. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. §65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or … upon assignment by the applicant … shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law … (emphasis added).

42.     Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a healthcare provider is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the healthcare provider, such as independent contractors.

43.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

44.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

45.     Pursuant to New York Insurance Law § 403, the NF-3 and HCFA-1500 forms submitted by a healthcare provider to Liberty Mutual, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for instance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     Defendants' Fraudulent Scheme

### A.     Overview of the Scheme

46.     Beginning in 2019, and continuing through the present day, Vavikova, the PC Defendants, and John Doe Defendants "1" – "10" (collectively, the "Defendants"), masterminded and implemented a complex fraudulent scheme in which the PC Defendants were used to bill Liberty Mutual and other New York automobile insurers hundreds of thousands of dollars for medically unnecessary, illusory, and otherwise non-reimbursable services purportedly provided to Insureds on a transient basis.

47.     As part of the scheme, Vavikova and the PC Defendants subjected Insureds to medically unnecessary and illusory healthcare services in the form of purported diagnostic ultrasounds (most typically associated with prenatal fetal imaging), solely to maximize profits without regard to genuine patient care in connection with the alleged treatment of New York automobile accident victims eligible for coverage within the New York No-fault insurance system.

48.     The PC Defendants purport to be legitimate medical professional corporations and healthcare practices but instead operated as part of a large-scale fraud scheme that exploited Liberty Mutual's Insureds, as well as insureds of other New York automobile insurers.

49.     The Fraudulent Services billed under the PC Defendants were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds, and were further provided pursuant to the direction of unlicensed laypersons not permitted by law to render healthcare services.

50.     Vavikova did not operate the PC Defendants at any single, fixed location.

51.     Vavikova did not market the existence of any of the PC Defendants to the general public.

52.     Vavikova did not advertise for patients, never sought to build name recognition, or make any legitimate efforts of her own to attract patients on behalf of any of the PC Defendants.

53.     Vavikova did not have her own patients and did nothing to create a patient base.

54.     Vavikova did virtually nothing that would be expected of the owner of a legitimate medical professional corporation to develop their reputation and attract patients.

55.     Vavikova operated the PC Defendants on an itinerant basis from various "No-Fault" medical clinics, primarily located in Queens, Brooklyn and the Bronx, where the PC Defendants received steady volumes of patients through no efforts of their own, including at the following clinics (collectively, the "Clinics"):

| Clinic Location | | |
|---|---|---|
| 488 Lafayette Avenue | Brooklyn | New York |
| 92-05 Rockaway Boulevard | Ozone Park | New York |
| 62-69 99th Street | Rego Park | New York |
| 4014A Boston Road | Bronx | New York |
| 148-21 Jamaica Avenue | Jamaica | New York |
| 2273 65th Street | Brooklyn | New York |
| 79-45 Metropolitan Avenue | Flushing | New York |
| 37 Smith Street | Freeport | New York |
| 108-25 Merrick Boulevard | Jamaica | New York |
| 225-21 Linden Boulevard | Cambria Heights | New York |
| 92-08 Liberty Avenue | Jamaica | New York |
| 2184 Flatbush Avenue | Brooklyn | New York |
| 550 Remsen Avenue | Brooklyn | New York |
| 127 Post Avenue | Brooklyn | New York |
| 3407 White Plains Road | Bronx | New York |
| 172-17 Jamaica Avenue | Jamaica | New York |
| 37-23 72nd Street | Jackson Heights | New York |
| 4250 White Plains Road | Bronx | New York |
| 3140 Tremont Avenue | Bronx | New York |
| 1100 Pelham Parkway | Bronx | New York |
| 717-719 Southern Boulevard | Bronx | New York |
| 788 Southern Boulevard | Bronx | New York |

56.     Vavikova and the PC Defendants, in order to obtain access to the Clinics' patient base (i.e., Insureds), entered into illegal financial and kickback arrangements with the unlicensed laypersons who provided access to the patients that were treated, or who purported to be treated, at the Clinics.

57.     Vavikova and the PC Defendants thereafter subjected every Insured to "serial" ultrasounds beginning soon after their accident -- despite the complete absence of any support in

the recognized medical literature for such course of treatment -- solely  to extract the maximum billing out of each Insured from Liberty Mutual and other New York automobile insurers.

        **B.**     **The Illegal Kickbacks and Referral Relationships**

58.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality were organized to supply "one-stop" shops for no-fault insurance fraud.

59.     In order to obtain access to the Clinics' patient base (i.e., Insureds), Vavikova entered into illegal kickback and referral arrangements with unlicensed laypersons and/or healthcare professionals who "brokered" or "controlled" access to patients treated, or purported to be treated, at the Clinics.

60.     In exchange for being allowed to perform the Fraudulent Services, Defendants paid the clinic controllers and/or referring medical providers and agreed that the results of the Fraudulent Services would be pre-ordained so they could be used to justify further treatment and billing to Liberty Mutual (and likely other insurers) by the healthcare providers at the Clinics.

61.     The relationships that allowed Defendants to operate their transient healthcare practices were not designed for a legitimate purpose.

62.     Vavikova knew and understood that she could gain access to these Clinics and their steady stream of patients only if she agreed to pay kickbacks or other forms of financial consideration to the owners and controllers of the Clinics, and other laypersons supplying patients to the Clinics.

63.     Likewise, the Clinics caused Insureds to be referred to the PC Defendants knowing that the PC Defendants' services played no genuine role in the treatment or care of Insureds.

64.     Intertwining their illegitimate goals, Defendants and the healthcare providers and/or clinic controllers at the Clinics agreed that Defendants would be given access to the Clinics' Insureds in exchange for: (i) payments, such as those in the form of ostensibly legitimate fees for "rent," equipment, personnel, transportation, or other types of services and/or (ii) providing the Fraudulent Services, which virtually always supported continued performance of healthcare services by the healthcare providers and/or clinic controllers at the Clinics. This quid-pro-quo allowed Defendants to financially benefit through access to patients needed in order to submit their fraudulent billing and enabled John Doe Defendants "1" – "10", and other healthcare providers and/or clinic controllers to financially benefit by way of direct payments and/or from Defendants' treatment protocol purportedly justifying further billing for the healthcare providers' and/or clinic controllers' medically unnecessary services.

65.     The PC Defendants "success" in generating profits was the product of these improper financial and referral arrangements, rather than through any legitimate means, and enabled the PC Defendants to provide the Fraudulent Services at as many different Clinic locations as possible to maximize billing while, at the same time, making it harder for Liberty Mutual to detect the totality of Defendants' fraudulent scheme.

66.     These Clinic locations were "revolving doors" of healthcare providers, billing for services purportedly provided to Insureds at the location, all geared towards exploiting New York's No-Fault insurance system.

67.     In fact, Liberty Mutual received billing from many of the Clinics from an ever-changing number of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond

circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

68.     The Clinics were nothing more than hubs for a "revolving door" of medical providers, with each clinic typically housing numerous different healthcare providers rendering services from the location.

69.     For example, Liberty Mutual has received billing for purported healthcare services rendered at a Clinic located at 79-45 Metropolitan Avenue, Flushing, New York from a "revolving door" of approximately 60 or more separate healthcare providers.

70.     In addition, Liberty Mutual has received billing for purported healthcare services rendered at a Clinic located at 550 Remsen Avenue, Brooklyn, New York from a "revolving door" of approximately 40 or more separate healthcare providers.

71.     Further, Liberty Mutual has received billing for purported healthcare services rendered at a Clinic located at 4250 White Plains Road, Bronx from a "revolving door" of approximately thirty-five (35) or more separate healthcare providers. In fact, Liberty Mutual has learned that the owner of two physical therapy professional corporations that operated at the 4250 White Plains Road, Bronx location improperly "loaned" his physical therapy license to laypersons who then billed for medically unnecessary range of motion tests.

72.     Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, created and controlled the patient base at the Clinics and worked with Defendants to dictate the services that were provided, without regard to legitimate patient care.

73.     For example:

     (i)     Liberty Mutual has been advised by a physician that allegedly billed for healthcare services from: (i) 108-25 Merrick Boulevard, Jamaica; (ii) 4250 White Plains Road, Bronx; (iii) 488 Lafayette Avenue, Brooklyn; (iv) 719 Southern Boulevard, Bronx; and (v) 2184 Flatbush Avenue, Brooklyn, that

he did not provide or supervise any medical or healthcare related services at those locations.

(ii)  Liberty Mutual has been advised by a physician that allegedly billed for healthcare services from Clinics located at: (i) 488 Lafayette Avenue, Brooklyn; (ii) 79-45 Metropolitan Avenue, Flushing; and (iii) 148-21 Jamaica Avenue, Jamaica, that: (i) he did not authorize anyone to submit billing for the healthcare services under his name; (ii) he never performed or reviewed any of the healthcare services; (iii) the signatures on the medical records, bills, and claim related documents are forgeries and/or unauthorized duplicates; (iv) he never authorized anyone to receive or deposit checks on his behalf into any bank accounts; (v) he never received payment for the healthcare services; (vi) he had no knowledge of the collection counsel that was collecting on his behalf; and (vii) he had never visited the locations where the healthcare services were allegedly being performed.

(iii)  Further, Liberty Mutual has also been advised by another physician that allegedly performed healthcare services from Clinics located at: (i) 2273 65th Street, Brooklyn; (ii) 550 Remsen Avenue, Brooklyn; (iii) 148-21 Jamaica Avenue, Jamaica; (iv) 488 Lafayette Avenue, Brooklyn; and (v) 79-45 Metropolitan Avenue, Flushing, that she did not perform any of the billed-for healthcare services, nor did she authorize anyone to use her TIN, address, or signature to bill for the healthcare services.

(iv)  Liberty Mutual has also been advised by a physician that purportedly billed for healthcare services at 37 Smith Street, Freeport, that: (i) he did not perform or authorize any of the healthcare services; (ii) he did not authorize anyone to bill for the healthcare services; and (iii) the signatures on the medical records, bills, and claim related documents are forgeries and/or unauthorized duplicates.

(v)  Liberty Mutual has been further advised by a physician that allegedly billed for healthcare services from: (i) 4250 White Plains Road, Bronx; (ii) 4014A Boston Road, Bronx; (iii) 62-69 99th Street, Rego Park; (vi) 2184 Flatbush Avenue, Brooklyn, and (v) 148-21 Jamaica Avenue, Jamaica, that: (a) she did not perform any of the billed-for healthcare services or authorize anyone to use her TIN, address, or signature to bill for the healthcare services; (b) she had no knowledge of the performance of the healthcare services or the locations where the healthcare services were purportedly performed; and (c) any documentation purporting to bear her signature is either a forgery and/or an unauthorized duplicate.

74.  Furthermore, one or more of the Clinics from which Defendants operated are part of the clinics at issue in United States of America v. Anthony Rose, et al., 19-cr-00789 (PGG)

(S.D.N.Y.) ("USA v. Rose"), wherein numerous individuals were indicted for paying bribes to 911 operators, medical personnel, NYPD officers, and others in exchange for confidential patient information that was used to steer them to a network of medical clinics (and lawyers) where the clinic controllers paid kickbacks in exchange for the referrals.

75.     The Defendants made the various kickback payments in exchange for having Insureds referred to the PC Defendants for the medically unnecessary Fraudulent Services at the Clinics, regardless of the individual's symptoms, presentment, or actual need for additional treatment.

76.     The Defendant's improper financial and referral arrangements were essential to the success of their scheme. The Defendants benefitted financially from their relationship with the Clinics because without access to Insureds' they could not perform the Fraudulent Services, bill Liberty Mutual, or generate income from insurance claim payments.

77.     At the same time, the voluminous list of healthcare services rendered to Insureds by healthcare providers at the Clinics in connection with the Fraudulent Services listed in Exhibits "1" and "2" were enabled by the Defendants' performance of the Fraudulent Services.

78.     At nearly all of the Clinics, the Insureds were subjected to multiple medical, chiropractic, acupuncture, and neurological evaluations, numerous modality treatments, and a variety of other diagnostic tests, which rendered the actual necessity of the Fraudulent Services performed by Defendants superfluous and provided solely to enrich Defendants and the healthcare providers and/or clinic controllers with which they had improper financial and referral arrangements.

79.    But for the payment of kickbacks and/or referral fees, the healthcare providers and/or clinic controllers at the various Clinics had no reason to permit the PC Defendants to access the patient base at the Clinics.

80.    Defendants knew that these arrangements were illegal and were therefore complicit in taking affirmative steps to conceal the existence of the fraudulent referral scheme.

**C.    The Defendants' Fraudulent Treatment and Billing Protocols**

81.    Defendants' billed Liberty Mutual and the New York automobile insurance industry for hundreds of thousands of dollars for the performance of the Fraudulent Services.

82.    Regardless of the nature of the accidents or the actual medical needs of the Insureds, the Defendants, pursuant to the dictates of John Doe Defendants "1" – "10", purported to subject Insureds to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

83.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

84.    No legitimate chiropractor or other licensed healthcare provider or professional corporation would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

85.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed because the Defendants' sought to profit from the fraudulent billing submitted to Liberty Mutual and other insurers.

1.      **The Medically Unnecessary Musculoskeletal Diagnostic Ultrasounds**

86.      Once an Insured was referred to the PC Defendants, the PC Defendants purported to provide the Insureds with bogus, useless, and medically unnecessary musculoskeletal diagnostic ultrasounds.

87.      As set forth in Exhibits "1" and "2", the diagnostic ultrasounds were then billed through the respective PC Defendants to Liberty Mutual under CPT code 76999, typically resulting in a charge ranging from $124.13 to $186.20 for each ultrasound they purported to provide.

88.      The charges for the diagnostic ultrasounds were fraudulent in that the tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent treatment protocols and illegal kickback and referral arrangements between the Defendants, and not pursuant to the documented and clinically reasonable needs of the Insured.

89.      Further, the charges for the diagnostic ultrasounds identified in Exhibits "1" and "2" falsely reported that such diagnostic ultrasounds were legitimately performed in the first instance. Rather, the diagnostic ultrasounds were performed to maximize the Defendant's ability to bill Liberty Mutual and other insurers for medically unnecessary and useless diagnostic ultrasounds billed through the PC Defendants.

(a)  Basic, Legitimate Musculoskeletal Diagnostic Ultrasounds

90.      Ultrasound testing is an imaging technique that relies on detection of the reflections or echoes generated as high-frequency sound waves that are passed into the body. Physicians commonly use this technique for a number of appropriate medical imaging purposes, such as the investigation of prenatal fetal imaging, abdominal and pelvic masses and cardiac echocardiogram.

91.     The American Institute of Ultrasound Medicine which consists of thousands of healthcare professionals and is dedicated to advancing the safe and effective use of ultrasound medicine, determined in relevant part, that ultrasounds should be used only by qualified health professionals to provide medical benefit to the patient.

92.     There is no medical support for the use of diagnostic ultrasounds in the evaluation of an automobile accident victim's response to treatment who is suffering radicular symptoms.

93.     Despite the lack of medical value or medical utility in the context of automobile accident victims suffering radicular symptoms, the Defendants routinely submitted or caused to be submitted fraudulent billing to Liberty Mutual for diagnostic ultrasounds through the PC Defendants.

94.     In keeping with the fact that the Defendants provided the diagnostic ultrasounds – to the extent they were provided at all – pursuant to a predetermined, fraudulent protocol, the Defendants purportedly provided multiple diagnostic ultrasounds to every Insured. The diagnostic ultrasounds were worthless and of no clinical value in the manner used by the Defendants to purportedly evaluate Insureds response to treatment presenting with radicular symptoms resulting from car accidents.

95.     The medically useless diagnostic ultrasounds were part of the Defendants' predetermined fraudulent treatment and billing protocols, and was designed solely to financially enrich the Defendants, rather than to benefit any of the Insureds who were subjected to the purported tests.

(b) The Fraudulent Findings Regarding the Status of the Insured

96.     In keeping with the fact that the diagnostic ultrasounds were part of a predetermined fraudulent treatment and billing protocol pursuant to illegal kickback and referral arrangements

between the Defendants designed to financially enrich the Defendants rather than to benefit the Insureds, in many cases, the PC Defendants purported to provide diagnostic ultrasounds to Insureds soon after their accident, without giving the Insureds the opportunity to sufficiently respond to established, conservative therapy.

97.     Often times, Insureds were subjected to diagnostic ultrasounds by the PC Defendants less than ten (10) days after their accident: For example:

(i)     The Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named JP on October 28, 2021, only five days after the Insured's accident on October 23, 2021.

(ii)    The Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named GF on November 4, 2021, only five days after the Insured's accident on October 30, 2021.

(iii)   The Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named RE on May 25, 2022, only five days after the Insured's accident on May 20, 2022.

(iv)    The Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named NW on November 16, 2021, only six days after the Insured's accident on November 10, 2021.

(v)     The Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named KB on November 8, 2021, only eight days after the Insured's accident on October 31, 2021.

(vi)    The Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named JT on May 11, 2022, only eight days after the Insured's accident on May 3, 2022.

(vii)   The Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named JA on June 30, 2021, only nine days after the Insured's accident on June 21, 2021.

(viii)  The Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named RF on May 31, 2022, only nine days after the Insured's accident on May 18, 2022.

(ix)     The Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named JS on January 28, 2022, only ten days after the Insured's accident on January 18, 2022.

(x)      The Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named NR on August 6, 2021, only ten days after the Insured's accident on July 27, 2021.

(xi)     The Defendants purported to provide diagnostic ultrasounds through Star Chiropractic to an Insured named KJ on August 10, 2022, only two days after the Insured's accident on August 8, 2022.

(xii)    The Defendants purported to provide diagnostic ultrasounds through Star Chiropractic to an Insured named MF on August 10, 2022, only two days after the Insured's accident on August 8, 2022.

(xiii)   The Defendants purported to provide diagnostic ultrasounds through Star Chiropractic to an Insured named VE on July 6, 2022, only six days after the Insured's accident on June 30, 2022.

(xiv)    The Defendants purported to provide diagnostic ultrasounds through Star Chiropractic to an Insured named MS on July 29, 2022, only seven days after the Insured's accident on July 22, 2022.

(xv)     The Defendants purported to provide diagnostic ultrasounds through Star Chiropractic to an Insured named RJ on October 10, 2022, only seven days after the Insured's accident on October 3, 2022.

(xvi)    The Defendants purported to provide diagnostic ultrasounds through Star Chiropractic to an Insured named AC on July 21, 2022, only eight days after the Insured's accident on July 13, 2022.

(xvii)   The Defendants purported to provide diagnostic ultrasounds through Star Chiropractic to an Insured named EO on June 8, 2022, only nine days after the Insured's accident on May 30, 2022.

(xviii)  The Defendants purported to provide diagnostic ultrasounds through Star Chiropractic to an Insured named BK on June 15, 2022, only nine days after the Insured's accident on June 6, 2022.

(xix)    The Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named JE on September 21, 2022, only nine days after the Insured's accident on September 12, 2022.

(xx)    The Defendants purported to provide diagnostic ultrasounds through Star Chiropractic to an Insured named LS on June 30, 2022, only ten days after the Insured's accident on June 20, 2022.

98.    What is more, despite the lack of time between the Insured's accidents and their purported diagnostic ultrasounds, on almost every diagnostic ultrasound report, the notes regarding the patient's status contains the following language:

> **STATUS OF THE PATIENT:** Subacute or chronic status. The patient doesn't get better in spite of intense treatment.

99.    This boilerplate language not only fails to describe what "intense treatment" the Insured is purportedly receiving, but also fails to detail the response the Insured is having to such treatment.

100.    Furthermore, as illustrated above, in many cases, such "intense treatment" took place over an extraordinarily short time period following the date of the Insured's accident.

101.    Additionally, the findings regarding the status of the patient contained not only pre-printed boilerplate language designed to further the Defendants fraudulent treatment protocol and maximize their ill-gotten gains, but were actually medically inaccurate.

102.    Subacute pain is defined as pain that has been present for at least 6 weeks but less than 3 months.

103.    Chronic pain is defined as pain that presents for more than three months or pain that restricts daily activities for longer than twelve weeks.

104.    Here, patients had their pain categorized as subacute or chronic, despite the fact that often times, the diagnostic ultrasounds on which the Defendants based their findings regarding the patient's status, were performed shortly after the Insured's accident.

105.    For example:

(i)     On April 27, 2022, 21 Century Chiropractic purported to provide diagnostic ultrasounds to an Insured named JF. Despite the fact that JF's accident occurred just six days before on April 21, 2022, 21 Century Chiropractic described JF's status as "subacute or chronic."

(ii)    On April 12, 2022, 21 Century Chiropractic purported to provide diagnostic ultrasounds to an Insured named SF. Despite the fact that SF's accident occurred just one and a half weeks before on April 3, 2022, 21 Century Chiropractic described SF's status as "subacute or chronic."

(iii)   On April 21, 2022, 21 Century Chiropractic purported to provide diagnostic ultrasounds to an Insured named JM. Despite the fact that JM's accident occurred just two and a half weeks before on April 3, 2022, 21 Century Chiropractic described JM's states as "subacute or chronic."

(iv)    On April 11, 2022, 21 Century Chiropractic purported to provide diagnostic ultrasounds to an Insured named AG. Despite the fact that AG's accident occurred just four weeks before on March 12, 2022, 21 Century Chiropractic described AG's status as "subacute or chronic."

(v)     On April 15, 2022, 21 Century Chiropractic purported to provide diagnostic ultrasounds to an Insured named LM. Despite the fact that LM's accident occurred just four weeks before on March 13, 2022, 21 Century Chiropractic described LM's status as "subacute or chronic."

(vi)    On July 20, 2022, Star Chiropractic purported to provide diagnostic ultrasounds to an Insured named KB. Despite the fact that KB's accident occurred just two weeks prior before on July 7, 2022, Star Chiropractic described KB's status as "sub-acute."

(vii)   On July 13, 2022, Star Chiropractic purported to provide diagnostic ultrasounds to an Insured named PD. Despite the fact that PD's accident occurred just two and a half weeks before on June 26, 2022, Star Chiropractic described PD's status as "subacute."

(viii)  On June 14, 2022, Star Chiropractic purported to provide diagnostic ultrasounds to an Insured named TG. Despite the fact that TG's accident occurred just three weeks before on May 25, 2022, Star Chiropractic described TG's status as "subacute or chronic."

(ix)    On June 16, 2022, Star Chiropractic purported to provide diagnostic ultrasounds to an Insured named OI. Despite the fact that OI's accident occurred just three weeks before on May 22, 2022, Star Chiropractic described OI's status as "subacute or chronic."

(x)   On June 16, 2022, Star Chiropractic purported to provide diagnostic ultrasounds to an Insured named JI. Despite the fact that JI's accident occurred just three weeks before on May 22, 2022, Star Chiropractic described OI's status as "subacute or chronic."

106.   In short, in all of the claims identified in Exhibits "1" and "2", the Defendants falsely represented that the musculoskeletal diagnostic ultrasounds were medically necessary, when in fact they were not medically necessary for each Insured and were instead provided pursuant to pre-determined fraudulent protocols and illegal kickback and referral arrangements between the Defendants and were therefore not eligible to collect No-Fault Benefits in the first instance.

(c)   The Medically Useless Physician Referrals and "Serial" Ultrasounds

107.   As set forth in Exhibits "1" and "2", the diagnostic ultrasounds were billed through the respective PC Defendants to Liberty Mutual under CPT code 76999 usually resulting in a charge of $124.13 or $186.20, per body part.

108.   The charges for the diagnostic ultrasounds were fraudulent in that the diagnostic ultrasounds were medically unnecessary, and were conducted, to the extent that they were conducted at all, pursuant to the improper financial agreements between the Defendants, and not pursuant to the documented and clinically reasonable needs of the Insureds.

109.   In a legitimate clinical setting, the decision to perform a diagnostic ultrasound would be based upon a written or electronic request originating from a physician or other appropriately licensed healthcare provider or under the physician or healthcare provider's direction, which would include a detailed history of the patient's treatment.

110.   In virtually every case where the PC Defendants provided an Insured with a diagnostic ultrasound, the ultrasound referral came from a physician who was operating out of the same Clinic as the PC Defendants.

111.    These referrals contained virtually no information about the Insured's condition or prior treatment and consisted of the Insured's basic information, a list of differential diagnoses, and a boilerplate "medical necessity" statement. Regardless of which physician provided the ultrasound referral, the referral was always identical in nature as described below:





112.    In keeping with the fact that the diagnostic ultrasounds purportedly performed by the PC Defendants were medically useless and performed in order to maximize the billing the Defendants could submit to Liberty Mutual, every Insured that received a diagnostic ultrasound from the PC defendants was subjected to "serial" ultrasounds.

113.    In fact, every Insured purportedly treated by the PC Defendants received between three and nine ultrasounds on one date of service.

114.    For example:

(i)      On November 26, 2021, 21 Century Chiropractic purported to provide nine diagnostic ultrasounds to an Insured named EL. 21 Century Chiropractic then billed Liberty Mutual approximately $1,365.45 for these ultrasounds.

(ii)     On December 27, 2021, 21 Century Chiropractic purported to provide nine diagnostic ultrasounds to an Insured named JR. 21 Century Chiropractic then billed Liberty Mutual approximately $1,365.45 for these ultrasounds.

(iii)    On December 4, 2021, 21 Century Chiropractic purported to provide eight diagnostic ultrasounds to an Insured named MB. 21 Century Chiropractic then billed Liberty Mutual approximately $1,489.60 for these ultrasounds.

(iv)     On January 24, 2022, 21 Century Chiropractic purported to provide eight diagnostic ultrasounds to an Insured named CN. 21 Century Chiropractic then billed Liberty Mutual approximately $1,241.32 for these ultrasounds.

(v)      On February 15, 2022, 21 Century Chiropractic purported to provide eight diagnostic ultrasounds to an Insured named JM. 21 Century Chiropractic then billed Liberty Mutual approximately $1,427.53 for these ultrasounds.

(vi)     On June 2, 2022, 21 Century Chiropractic purported to provide eight diagnostic ultrasounds to an Insured named ET. 21 Century Chiropractic then billed Liberty Mutual approximately $1,241.32 for these ultrasounds.

(vii)    On August 2, 2021, 21 Century Chiropractic purported to provide eight diagnostic ultrasounds to an Insured named CR. 21 Century Chiropractic then billed Liberty Mutual approximately $1,140.00 for these ultrasounds.

(viii)   On January 13, 2022, 21 Century Chiropractic purported to provide seven diagnostic ultrasounds to an Insured named CR. 21 Century Chiropractic then billed Liberty Mutual approximately $1,241.33 for these ultrasounds.

(ix)     On February 28, 2022, 21 Century Chiropractic purported to provide seven diagnostic ultrasounds to an Insured named SB. 21 Century Chiropractic then billed Liberty Mutual approximately $1,117.19 for these ultrasounds.

(x)      On February 24, 2022, 21 Century Chiropractic purported to provide seven diagnostic ultrasounds to an Insured named AN. 21 Century Chiropractic then billed Liberty Mutual approximately $1,117.19 for these ultrasounds.

(xi)     On September 14, 2022, Star Chiropractic purported to provide nine diagnostic ultrasounds to an Insured named KH. Star Chiropractic then billed Liberty Mutual approximately $1,303.38 for these ultrasounds.

(xii)    On June 23, 2022, Star Chiropractic purported to provide eight diagnostic ultrasounds to an Insured named JG. Star Chiropractic then billed Liberty Mutual approximately $1,241.32 for these ultrasounds.

(xiii)   On June 14, 2022, Star Chiropractic purported to provide eight diagnostic ultrasounds to an Insured named TG. Star Chiropractic then billed Liberty Mutual approximately $1,365.45 for these ultrasounds.

(xiv)    On November 22, 2022, Star Chiropractic purported to provide seven diagnostic ultrasounds to an Insured named VR. Star Chiropractic then billed Liberty Mutual approximately $1,055.12 for these ultrasounds.

(xv)    On November 28, 2022, Star Chiropractic purported to provide seven diagnostic ultrasounds to an Insured named AD. Star Chiropractic then billed Liberty Mutual approximately $1,303.39 for these ultrasounds.

(xvi)    On December 5, 2022, Star Chiropractic purported to provide seven diagnostic ultrasounds to an Insured named GK. Star Chiropractic then billed Liberty Mutual approximately $1,117.19 for these ultrasounds.

(xvii)    On January 9, 2023, Star Chiropractic purported to provide seven diagnostic ultrasounds to an Insured named LB. Star Chiropractic then billed Liberty Mutual approximately $1,117.19 for these ultrasounds.

(xviii)    On September 27, 2022, Star Chiropractic purported to provide seven diagnostic ultrasounds to an Insured named TT. Star Chiropractic then billed Liberty Mutual approximately $1,179.25 for these ultrasounds.

(xix)    On December 29, 2022, Star Chiropractic purported to provide six diagnostic ultrasounds to an Insured named JE. Star Chiropractic then billed Liberty Mutual approximately $1,055.12 for these ultrasounds.

(xx)    On December 12, 2022, Star Chiropractic purported to provide six diagnostic ultrasounds to an Insured named JN. Star Chiropractic then billed Liberty Mutual approximately $993.06 for these ultrasounds.

115.    There is a complete absence in the recognized medical literature that supports the concept of performing multiple diagnostic ultrasounds to evaluate a patient's response to treatment. In an attempt to extract the maximum billing out of each Insured who supposedly received diagnostic ultrasounds, Defendants routinely purported to perform far more diagnostic ultrasounds then medically necessary, and then submitted billing to Liberty Mutual through the PC Defendants.

116.    What is more, in every case, no matter how many ultrasounds were provided to the Insured, the diagnostic ultrasound reports indicate that the time took to perform the ultrasounds was one hour.

117.    It is extraordinarily unlikely, to the point of impossibility, that it would take one hour to perform three diagnostic ultrasounds on a patient, and one hour to perform nine diagnostic ultrasounds on a patient, every single time.

118.    In fact, there was no variability in time whatsoever despite what body parts were being subjected to ultrasounds. Thus, no matter how large or small the body part was, the Defendant's fraudulently alleged that the purported ultrasounds took one hour to perform.

119.    In many cases, the Insureds were purportedly subjected to more than one session of serial ultrasounds despite the fact that only a minimal amount of time had passed between the first and subsequent sets of ultrasounds that would have allowed the Insureds to benefit from further treatment or a change in treatment based on their ultrasound reports.

120.    Furthermore, the Defendants routinely performed the diagnostic ultrasounds on multiple sessions without any documentation or evidence of a change in treatment based on the findings of the ultrasounds. In fact, there was no indication from the Defendants that the Insureds treatment changed. Likewise, even if the treatment had changed – which it did not - not enough time had passed since the initial diagnostic ultrasound session that would have justified a second, or in some cases, third diagnostic ultrasound session, yet the Defendants continued their fraudulent treatment protocol. For example:

(i)     On May 9, 2022, the Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named SK. On that date, SK received ultrasounds to the following areas: (i) cervical spine; (ii) lumbar spine; (iii) thoracic spine; (iv) right and left shoulder; (v) left hand and wrist; and (vi) right ankle. Just seven days later on May 16, 2022, 21 Century Chiropractic purported to provide a second round of diagnostic ultrasounds to SK to the following areas: (i) cervical spine; (ii) lumbar spine; (iii) thoracic spine; (iv) right and left shoulder; (v) left and right knee; (vi) sacroiliac joints; and (vii) left wrist and hand. There was no indication that the Insured had engaged in a different treatment protocol based on the findings from any of the ultrasound sessions.

(ii)     On March 24, 2022, the Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named AB. On that date, AB received ultrasounds to the following areas: (i) cervical spine; (ii) lumber spine; (iii) thoracic spine; and (iv) sacroiliac joints. Just fourteen days later, on April 7, 2022, 21 Century Chiropractic purported to provide a second round of diagnostic ultrasounds to AB to the following areas: (i) cervical spine; (ii) lumbar spine; (iii) thoracic spine; (iv) sacroiliac joints; (v) right and left shoulder; and (vi) right and left hip. Once again, just fourteen days later on April 21, 2022, 21 Century Chiropractic purported to provide a third round of diagnostic ultrasounds to AB to the following areas: (i) cervical spine; (ii) lumbar spine; (iii) thoracic spine; and (iv) sacroiliac joints. There was no indication that the Insured had engaged in a different treatment protocol based on the findings from any of the ultrasound sessions.

(iii)    On February 8, 2022, the Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named AB. On that date, AB received ultrasounds to the following areas: (i) right shoulder; (ii) cervical spine; and (iii) lumbar spine. Just fourteen days later, on February 22, 2022, 21 Century Chiropractic purported to provide a second round of diagnostic ultrasounds to AB to the following areas: (i) right shoulder; (ii) cervical spine; (iii) lumber spine; (iv) thoracic spine; and (v) sacroiliac joints. There was no indication that the Insured had engaged in a different treatment protocol based on the findings from any of the ultrasound sessions.

(iv)     On March 4, 2022, the Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named AR. On that date, AR received ultrasounds to the following areas: (i) cervical spine; (ii) lumber spine; (iii) right and left shoulder; (iv) right and left knee; (v) thoracic spine; (vi) sacroiliac joints; and (vii) right and left elbow. Just fourteen days later, on March 22, 2022, 21 Century Chiropractic purported to provide a second round of diagnostic ultrasounds to AR to the following areas: (i) left shoulder; (ii) cervical spine; (iii) lumbar spine; (iv) thoracic spine; and (v) sacroiliac joints. Once again, twenty-one days later on April 12, 2022, 21 Century Chiropractic purported to provide a third round of diagnostic ultrasounds to AR to the following areas: (i) left shoulder; (ii) cervical spine; (iii) lumbar spine; (iv) thoracic spine; and (v) sacroiliac joints. There was no indication that the Insured had engaged in a different treatment protocol based on the findings from any of the ultrasound sessions.

(v)      On June 14, 2021, the Defendants purported to provide diagnostic ultrasounds through 21 Century Chiropractic to an Insured named JG. On that date, JG received ultrasounds to the following areas: (i) cervical spine; (ii) thoracic spine; (iii) lumbar spine; (iv) left knee; and (v) right and left ankle.  Just sixteen days later, on June 30, 2021, 21 Century Chiropractic purported to provide a second round of diagnostic ultrasounds to JG to the following areas: (i) cervical spine; (ii) thoracic spine; (iii) lumbar spine; and (iv) left and right

shoulder. There was no indication that the Insured had engaged in a different treatment protocol based on the findings from any of the ultrasound sessions.

(vi)    On October 10, 2022, the Defendants purported to provide diagnostic ultrasounds through Star Chiropractic to an Insured named PR. On that date, PR received ultrasounds to the following areas: (i) cervical spine; (ii) lumbar spine; (iii) thoracic spine; (iv) left shoulder; and (v) sacroiliac joints. Just seven days later on May 17, 2022, Star Chiropractic purported to provide a second round of diagnostic ultrasounds to PR to the following areas: (i) cervical spine; (ii) lumbar spine; (iii) thoracic spine; and (iv) sacroiliac joints. There was no indication that the Insured had engaged in a different treatment protocol based on the findings from any of the ultrasound sessions.

(vii)    On June 29, 2022, the Defendants purported to provide diagnostic ultrasounds through Star Chiropractic to an Insured named YM. On that date, YS received ultrasounds to the following areas: (i) cervical spine; (ii) lumbar spine; and (iii) left knee. Just nine days later on July 8, 2022, Star Chiropractic purported to provide a second round of diagnostic ultrasounds to YS to the following areas: (i) cervical spine; (ii) lumbar spine; (iii) thoracic spine; (iv) left knee; and (v) sacroiliac joints. There was no indication that the Insured had engaged in a different treatment protocol based on the findings from any of the ultrasound sessions.

(viii)    On July 21, 2022, the Defendants purported to provide diagnostic ultrasounds through Star Chiropractic to an Insured named EL. On that date, EL received ultrasounds to the following areas: (i) cervical spine; (ii) lumbar spine; (iii) thoracic spine; (iv) left shoulder; and (v) sacroiliac joints. Just nineteen days later on August 9, 2022, Star Chiropractic purported to provide a second round of diagnostic ultrasounds to EL to the following areas: (i) cervical spine; (ii) lumbar spine; (iii) thoracic spine; (iv) left shoulder; and (v) sacroiliac joints. There was no indication that the Insured had engaged in a different treatment protocol based on the findings from any of the ultrasound sessions.

(ix)    On July 11, 2022, the Defendants purported to provide diagnostic ultrasounds through Star Chiropractic to an Insured named PB. On that date, PB received ultrasounds to the following areas: (i) cervical spine; (ii) lumbar spine; (iii) thoracic spine; (iv) right and left shoulder; and (v) sacroiliac joints. Just twenty-eight days later on August 8, 2022, Star Chiropractic purported to provide a second round of diagnostic ultrasounds to PB to the following areas: (i) cervical spine; (ii) lumbar spine; (iii) thoracic spine; (iv) right and left shoulder; and (v) sacroiliac joints. There was no indication that the Insured had engaged in a different treatment protocol based on the findings from any of the ultrasound sessions.

(x)     On September 2, 2022, the Defendants purported to provide diagnostic ultrasounds through Star Chiropractic to an Insured named SM. On that date, SM received ultrasounds to the following areas: (i) left shoulder (ii) lumbar spine; (iii) thoracic spine; (iv) sacroiliac joints. Just twenty-one days later on September 23, 2022, Star Chiropractic purported to provide a second round of diagnostic ultrasounds to SM to the following areas: (i) left shoulder; (ii) cervical spine; (iii) lumbar spine; (iv) thoracic spine; and (v) sacroiliac joints. There was no indication that the Insured had engaged in a different treatment protocol based on the findings from any of the ultrasound sessions.

121.    The serial ultrasound approach that the PC Defendants purported to provide to Insureds clearly was not based on medical necessity. Instead, it was designed solely to maximize the charges that the PC Defendants could submit to Liberty Mutual and other insurers, and to maximize their ill-gotten profits.

(d) The Medically Unnecessary Ultrasounds Purportedly Provided After Insureds Received MRIs

122.    As part of their pre-determined fraudulent treatment and billing protocol and illegal kickback and referral arrangements, the PC Defendants also purported to provide the medically unnecessary diagnostic ultrasounds to Insureds even after the Insureds had already received an MRI to the same body part.

123.    An ultrasound produces imagines of the soft tissues in a person's musculoskeletal system which can show issues with muscles, tendons, ligaments, and other connective tissue. An MRI can detect inflammation, tumors, congenital abnormalities, herniations, or degeneration and is considered a better diagnostic tool when viewing larger areas of soft tissue, joints, bones, muscles, or cartilage.

124.    The PC Defendants purported to subject many Insureds to diagnostic ultrasounds, supposedly to evaluate how the Insureds were responding to treatment following what was virtually always a minor automobile accident.

125.    As a threshold matter, the diagnostic ultrasounds were unnecessary because there is no legitimate medical evidence that diagnostic ultrasounds are useful in evaluating a person's response to treatment.

126.    In many cases, the diagnostic ultrasounds were also medically unnecessary because the Insureds who purportedly were subjected to them had already received MRIs which can and do provide higher quality imaging of larger areas of soft tissue and other structures, which therefore make them the superior imaging tool to ascertain the effectiveness of treatment.

127.    When a patient receives a musculoskeletal diagnostic ultrasound following an MRI, the diagnostic ultrasound imaging provides no new information. This is especially true when an MRI and ultrasound are done close in time.

128.    However, in order to maximize their ill-gotten gains, the Defendants routinely purported to perform and/or provide musculoskeletal diagnostic ultrasounds to Insureds as a secondary form of diagnostic imaging after the Insureds had already received an MRI. This, despite the fact that the Insureds had not suffered injuries that would warrant diagnostic ultrasounds, and – in any case – had no change in their treatment based on the findings of the MRIs and/or ultrasounds.

129.    For example:

(i)      On January 4, 2022, an Insured named JM received MRIs to his lumbar and thoracic spine. On January 16, 2022, JM received a second set of MRIs to his right shoulder and cervical spine. Thereafter, just two days later on January 18, 2022, 21 Century Chiropractic purported to perform diagnostic ultrasounds on JM to the following areas, among others: (i) cervical spine; (ii) lumbar spine; and (iii) thoracic spine, which was before JM had a chance to complete any legitimate change in treatment protocol based on the findings of the MRIs.

(ii)     On April 12, 2022, an Insured named SK received MRIs to her cervical and lumbar spine. Thereafter, on April 29, 2022 SK received a second set of MRIs to her left and right shoulder. On May 6, 2022, SK received a third MRI to her right ankle. Thereafter, just three days after her third ultrasound, 21 Century Chiropractic

purported to provide diagnostic ultrasounds on SK to the following areas, among others: (i) cervical spine; (ii) lumbar spine; (iii) right and left shoulder; and (iv) right ankle, which was before SK had a chance to complete any legitimate change in treatment protocol based on the findings of the MRIs.

(iii)   On May 14, 2022, an Insured named AM received MRIs to his lumbar and cervical spine. On May 28, 2022, AM received a second MRI to his left knee. Thereafter, just four days later on June 1, 2022, 21 Century Chiropractic purported to perform diagnostic ultrasounds to the following areas, among others: (i) cervical spine; (ii) lumbar spine; and (iii) left knee, which was before AM had a chance to complete any legitimate change in treatment protocol based on the findings of the MRIs.

(iv)   On May 11, 2022, an Insured named CH received an MRI to his left knee. Thereafter, just six days later on May 17, 2022, 21 Century Chiropractic purported to provide diagnostic ultrasounds on CH to the following areas, among others: (i) left knee, which was before CH had a chance to complete any legitimate change in treatment protocol based on the findings of the MRIs.

(v)   On March 24, 2022, an Insured named KT received an MRI to her right shoulder. Thereafter on April 4, 2022, KT received another MRI to her cervical spine. Just ten days later on April 14, 2022, 21 Century Chiropractic purported to provide two diagnostic ultrasounds to the following areas: (i) right shoulder; and (ii) cervical spine, which was before KT had a chance to complete any legitimate change in treatment protocol based on the findings of the MRIs.

(vi)   On January 21, 2022, an Insured named IS received MRIs to his left shoulder and cervical spine. On February 1, 2022, IS received a second MRI to his lumbar spine. Thereafter, just fourteen days later, on February 15, 2022, 21 Century Chiropractic purported to perform diagnostic ultrasounds on IS to the following areas, among others: (i) left shoulder; (ii) cervical spine; and (iii) lumbar spine, which was before IS had a chance to complete any legitimate change in treatment protocol based on the findings of the MRIs.

(vii)   On January 28, 2022, an Insured named CG received MRIs to her right shoulder and cervical spine. Just nineteen days later on February 16, 2022, 21 Century Chiropractic purported to provide diagnostic ultrasounds to the following areas, among others: (i) right shoulder; and (ii) cervical spine, which was before CG had a chance to complete any legitimate change in treatment protocol based on the findings of the MRIs.

(viii)   On March 17, 2022, an Insured named DK received an MRI to his left shoulder. Thereafter, just on April 15, 2022, 21 Century Chiropractic purported to provide diagnostic ultrasounds to the following areas, among others: (i) left shoulder, which was before DK had a chance to complete any legitimate change in treatment protocol based on the findings of the MRIs.

(ix)   On February 7, 2022, an Insured named SB received MRIs to her cervical and lumbar spine. Thereafter, on February 16, 2022, SB received another MRI to her thoracic spine. On March 17, 2022, 21 Century Chiropractic purported to provide two diagnostic ultrasounds to the following areas, among others: (i) spine, which was before SB had a chance to complete any legitimate change in treatment protocol based on the findings of the MRIs.

(x)   On July 21, 2022, an Insured named NS received MRIs to his right and left shoulder. Thereafter, just one day later on July 22, 2022, Star Chiropractic purported to provide diagnostic ultrasounds to the following areas, among others: (i) right shoulder; and (ii) left shoulder, which was before NS had a chance to complete any legitimate change in treatment protocol based on the findings of the MRI.

(xi)   On July 24, 2022, an Insured named SJ received an MRI to her lumbar spine. Thereafter, just eleven days later on August 4, 2022, Star Chiropractic purported to provide diagnostic ultrasounds to the following areas, among others: (i) lumbar spine, which was before SJ had a chance to complete any legitimate change in treatment protocol based on the findings of the MRIs.

(xii)   On August 19, 2022, an Insured named AS received an MRI to his left shoulder. Thereafter, just twelve days later on September 1, 2022, Star Chiropractic purported to perform diagnostic ultrasounds to the following areas, among others: (i) left shoulder, which was before AS had a chance to complete any legitimate change in treatment protocol based on the findings of the MRIs.

(xiii)   On June 3, 2022, an Insured named AA received MRIs to her lumbar spine and cervical spine. Thereafter, just eighteen days later on June 21, 2022, Star Chiropractic purported to provide diagnostic ultrasounds to the following areas, among others: (i) cervical spine; and (ii) lumbar spine, which was before AA had a chance to complete any legitimate change in treatment protocol based on the findings of the MRI.

(xiv)   On September 8, 2022, an Insured named TH received an MRI to his left knee. Thereafter, on October 10, 2022, Star Chiropractic purported to provide diagnostic ultrasounds to the following areas, among others: (i) left knee, which was before TH had a chance to complete any legitimate change in treatment protocol based on the findings of the MRI.

130.   As such, the charges for the diagnostic ultrasounds were fraudulent, medically unnecessary and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent treatment protocols and illegal kickback and referral arrangements

between the Defendants and others, not pursuant to the documented and clinically reasonable needs of the Insured.

### III.   The Fraudulent Billing Defendants Submitted or Caused to Be Submitted to Liberty Mutual

131.   To support their fraudulent charges, Defendants systemically submitted or caused to be submitted hundreds of NF-3 forms, HCFA-1500 forms, and treatment reports through the PC Defendants to Liberty Mutual seeking payment for the Fraudulent Services for which Defendants are not entitled to receive payment.

132.   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted to Liberty Mutual by and on behalf of Defendants are false and misleading in the following material respects:

(i)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of Defendants uniformly misrepresented to Liberty Mutual that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of Defendants uniformly misrepresented and exaggerated the level and nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms, HCFA-1500 forms, and treatment reports submitted by and on behalf of the PC Defendants uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback and referral arrangements amongst the Defendants and other.

### IV.   Defendants' Fraudulent Concealment and Liberty Mutual's Justifiable Reliance

133.   Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing and other documentation they submitted or caused to be submitted to Liberty Mutual.

134.    To induce Liberty Mutual to promptly pay charges for the Fraudulent Services, Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

135.    Specifically, Defendants knowingly misrepresented and concealed facts in order to prevent Liberty Mutual from discovering that Defendants derived their patient base and referrals through improper financial and referral relationships. Indeed, Defendants entered into improper financial kickback, and/or referral agreements that were designed to, and did, conceal the true nature of these arrangements.

136.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

137.    In addition, Defendants knowingly misrepresented and concealed facts to prevent Liberty Mutual from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to a pre-determined protocol that maximized the charges that could be submitted to Liberty Mutual.

138.    Defendants also knowingly misrepresented and concealed facts to prevent Liberty Mutual from discovering that, through their charges, Defendants misrepresented and exaggerated the level of services purportedly provided to maximize the charges submitted to Liberty Mutual.

139.    Liberty Mutual maintains standard office practices and procedures that are designed to and do ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

140.    In accordance with the No-Fault Laws, and Liberty Mutual's standard office practices and procedures, Liberty Mutual either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the PC Defendants; (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the PC Defendants; (iii) timely issued payment with respect to the claims submitted through the PC Defendants; or else (iv) the time in which to pay or deny the pending claims of No-Fault Benefits submitted through the PC Defendants, or to request additional verification of those claims, has not expired.

141.    Defendants also hired law firms to pursue collection of the fraudulent charges from Liberty Mutual and other insurers. These law firms routinely filed expensive and time-consuming litigation against Liberty Mutual and other insurers if the charges were not promptly paid in full.

142.    The Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located through the metropolitan area.

143.    Liberty Mutual is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to Liberty Mutual in support of the fraudulent charges at issue, combined with material misrepresentations and fraudulent litigation activity described above, were designed to and did cause Liberty Mutual to rely upon them. As a result, Liberty Mutual incurred damages of more than $236,000.00 based upon the fraudulent charges.

144.   Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Liberty Mutual, Liberty Mutual did not discovery and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
### Against the Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

145.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

146.   There is an actual case in controversy between Liberty Mutual and the Defendants regarding more than $484,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to Liberty Mutual under the names of the PC Defendants.

147.   The Defendants have no right to receive any payment for any pending bills submitted to Liberty Mutual because the Fraudulent Services were not medically necessary and were provided – to the extent they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

148.   The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements amongst the Defendants, and others.

149.   The Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual because the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided, in order to inflate the charges submitted to Liberty Mutual.

150. Accordingly, Liberty Mutual requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual.

## AS AND FOR A SECOND CAUSE OF ACTION
### Against Vavikova
### (Violation of RICO, 18 U.S.C. § 1962(c))

151. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

152. 21 Century Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affected interstate commerce.

153. Vavikova knowingly has conducted and/or participated, directly or indirectly, in the conduct of 21 Century Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statue, 18 U.S.C. 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges for over two years seeking payments that 21 Century Chiropractic was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iii) 21 Century Chiropractic obtained patients through the Defendants' illegal kickback scheme. The fraudulent billings and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "1".

154. 21 Century Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate act of mail fraud is the regular way in which Vavikova operated 21 Century Chiropractic, inasmuch as 21 Century Chiropractic was never eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential for 21 Century Chiropractic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through 21 Century Chiropractic to the present day.

155. 21 Century Chiropractic is engaged in inherently unlawful acts inasmuch as they continue to submit and attempt collection on fraudulent billing submitted to Liberty Mutual and other insurers. These inherently unlawful acts are taken by 21 Century Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent no-fault billing.

156. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $177,000.00 pursuant to the fraudulent bills submitted by the Defendants through 21 Century Chiropractic.

157. By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
**Against Vavikova and John Doe Defendants "1" – "10"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

158. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

159. 21 Century Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affected interstate commerce.

160. Vavikova and John Doe Defendants "1" – "10" are employed by and/or associated with 21 Century Chiropractic's enterprise.

161. Vavikova and John Doe Defendants "1" – "10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of 21 Century Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that 21 Century Chiropractic was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to financially enrich Defendants; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iii) 21 Century Chiropractic obtained their patients through the Defendants' illegal kickback scheme. The fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

162. Vavikova and John Doe Defendants "1" – "10" knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitted or facilitating the submission of fraudulent charges to Liberty Mutual.

163.   Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $177,000.00 pursuant to the fraudulent bills submitted by the Defendants through 21 Century Chiropractic.

164.   By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and other reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Against Vavikova and 21 Century Chiropractic**
**(Common Law Fraud)**

165.   Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

166.   Vavikova and 21 Century Chiropractic intentionally and knowingly made false and fraudulent statements of material face to Liberty Mutual and concealed facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

167.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for-services were medically necessary, when in fact the billed-for-services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to financially enrich Defendants; (ii) in every claim, the representation that the billed-for-services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for-services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual; and (iii) in every claim, the representation that 21 Century Chiropractic was properly licensed, and therefore,

eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme.

168.  Vavikova and 21 Century Chiropractic intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through 21 Century Chiropractic that were not compensable under the No-Fault Laws.

169.  Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $177,000.00 pursuant to the fraudulent bills submitted by Defendants through 21 Century Chiropractic.

170. Vavikova and 21 Century Chiropractic's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

171.  Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A FIFTH CAUSE OF ACTION
**Against Vavikova and 21 Century Chiropractic**
**(Unjust Enrichment)**

172. Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

173.  As set forth above, Vavikova and 21 Century Chiropractic has engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

174.  When Liberty Mutual paid the bills and charges submitted by or on behalf of 21 Century Chiropractic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and unjust billing scheme.

175.  Vavikova and 21 Century Chiropractic's retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

176.  By reason of the above, Vavikova and 21 Century Chiropractic have been unjustly enriched in an amount to be determined at trial, but in no event less than $177,000.00.

### AS AND FOR A SIXTH CAUSE OF ACTION
**Against John Doe Defendants "1" – "10"**
**(Aiding and Abetting Fraud)**

177.  Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

178.  John Doe Defendants "1" – "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Vavikova and 21 Century Chiropractic.

179.  The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to 21 Century Chiropractic in exchange for illegal kickbacks from Vavikova and 21 Century Chiropractic and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

180.  The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Vavikova and 21 Century Chiropractic to

obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from Liberty Mutual and other insurers for their Fraudulent Services.

181.  John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Vavikova and 21 Century Chiropractic for medically unnecessary, illusory, and otherwise non reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

182.  The conduct of John Doe Defendants '1" – "10" caused Liberty Mutual to pay more than $177,000.00 pursuant to the fraudulent bills submitted through 21 Century Chiropractic.

183.  This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

184.  Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Against Vavikova
### (Violation of RICO, 18 U.S.C. § 1962(c))

185.  Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

186.  Star Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affected interstate commerce.

187.  Vavikova knowingly has conducted and/or participated, directly or indirectly, in the conduct of Star Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statue, 18 U.S.C. 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a

continuous basis since its inception seeking payments that Star Chiropractic was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Defendants; (ii) the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iii) Star Chiropractic obtained patients through the Defendants' illegal kickback scheme. The fraudulent billings and corresponding mailings submitted to Liberty Mutual that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibit "2".

188.   Star Chiropractic's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate act of mail fraud is the regular way in which Vavikova operated Star Chiropractic, inasmuch as Star Chiropractic was never eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential for Star Chiropractic to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit and attempt collection on the fraudulent billing submitted through Star Chiropractic to the present day.

189.   Star Chiropractic is engaged in inherently unlawful acts inasmuch as they continue to submit and attempt collection on fraudulent billing submitted to Liberty Mutual and other insurers. These inherently unlawful acts are taken by Star Chiropractic in pursuit of inherently unlawful goals – namely, the theft of money from Liberty Mutual and other insurers through fraudulent no-fault billing.

190.  Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $59,000.00 pursuant to the fraudulent bills submitted by the Defendants through Star Chiropractic.

191.  By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Against Vavikova and John Doe Defendants "1" – "10"
### (Violation of RICO, 18 U.S.C. § 1962(d))

192.  Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

193.  Star Chiropractic is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affected interstate commerce.

194.  Vavikova and John Doe Defendants "1" – "10" are employed by and/or associated with Star Chiropractic's enterprise.

195.  Vavikova and John Doe Defendants "1" – "10" knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Star Chiropractic's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since its inception seeking payments that Star Chiropractic was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to financially enrich Defendants; (ii) the billing codes used for the Fraudulent Services

misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (iii) Star Chiropractic obtained their patients through the Defendants' illegal kickback scheme. The fraudulent bills and corresponding mailings submitted to Liberty Mutual that comprise the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

196.    Vavikova and John Doe Defendants "1" – "10" knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitted or facilitating the submission of fraudulent charges to Liberty Mutual.

197.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at lease $59,000.00 pursuant to the fraudulent bills submitted by the Defendants through Star Chiropractic.

198.    By reason of its injury, Liberty Mutual is entitled to treble damages, costs, and other reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A NINTH CAUSE OF ACTION
**Against Vavikova and Star Chiropractic**
**(Common Law Fraud)**

199.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

200.    Vavikova and Star Chiropractic intentionally and knowingly made false and fraudulent statements of material face to Liberty Mutual and concealed facts from Liberty Mutual in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

201.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for-services were medically necessary, when in fact the billed-for-services were not medically necessary and were performed and billed pursuant to a pre-determined, fraudulent protocol designed solely to financially enrich Defendants; (ii) in every claim, the representation that the billed-for-services were properly billed in accordance with the Fee Schedule, when in fact the billing codes used for the billed-for-services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to Liberty Mutual; and (iii) in every claim, the representation that Star Chiropractic was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through and illegal kickback scheme.

202.    Vavikova and Star Chiropractic intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through Star Chiropractic that were not compensable under the No-Fault Laws.

203.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least $59,000.00 pursuant to the fraudulent bills submitted by Defendants through Star Chiropractic.

204.    Vavikova and Star Chiropractic's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

205.    Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A TENTH CAUSE OF ACTION
### Against Vavikova and Star Chiropractic
### (Unjust Enrichment)

206.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

207.    As set forth above, Vavikova and Star Chiropractic has engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

208.    When Liberty Mutual paid the bills and charges submitted by or on behalf of Star Chiropractic for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and unjust billing scheme.

209.    Vavikova and Star Chiropractic's retention of Liberty Mutual's payments violates fundamental principles of justice, equity, and good conscience.

210.    By reason of the above, Vavikova and Star Chiropractic have been unjustly enriched in an amount to be determined at trial, but in no event less than $59,000.00.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
### Against John Doe Defendants "1" – "10"
### (Aiding and Abetting Fraud)

211.    Liberty Mutual incorporates, as though fully set forth herein, each and every allegation set forth above.

212.    John Doe Defendants "1" – "10" knowingly aided and abetted the fraudulent scheme that was perpetrated on Liberty Mutual by Vavikova and Star Chiropractic.

213.     The acts of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to Star Chiropractic in exchange for illegal kickbacks from Vavikova and Star Chiropractic and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

214.     The conduct of John Doe Defendants "1" – "10" in furtherance of the fraudulent scheme was significant and material. The conduct of John Doe Defendants "1" – "10" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Vavikova and Star Chiropractic to obtain referrals of patients at the Clinics, subject those patients to medically unnecessary services, and obtain payment from Liberty Mutual and other insurers for their Fraudulent Services.

215.     John Doe Defendants "1" – "10" aided and abetted the fraudulent scheme in a calculated effort to induce Liberty Mutual into paying charges to Vavikova and Star Chiropractic for medically unnecessary, illusory, and otherwise non reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

216.     The conduct of John Doe Defendants '1" – "10" caused Liberty Mutual to pay more than $59,000.00 pursuant to the fraudulent bills submitted through Star Chiropractic.

217.     This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles Liberty Mutual to recover punitive damages.

218.     Accordingly, by virtue of the foregoing, Liberty Mutual is entitled to compensatory and punitive damages, together with interests and costs, and any other relief the Court deems just and proper.

219.     Pursuant to Federal Rule of Civil Procedure 38(b), Liberty Mutual demands a trial by jury.

## JURY DEMAND

**WHEREFORE**, Plaintiffs Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana, and American States Insurance Company demand that a Judgement be entered in their favor:

A.     On the First Cause of Action against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual;

B.     On the Second Cause of Action against Vavikova, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $177,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Vavikova and John Doe Defendants "1" – "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $177,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Vavikova and 21 Century Chiropractic, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in

excess of $177,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

   E. On the Fifth Cause of Action against Vavikova and 21 Century Chiropractic, more than $177,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

   F. On the Sixth Cause of Action against John Doe Defendants "1" – "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $177,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper; and

   G. On the Seventh Cause of Action against Vavikova, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $59,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

   H. On the Eighth Cause of Action against Vavikova and John Doe Defendants "1" – "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $59,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

   I. On the Ninth Cause of Action against Vavikova and Star Chiropractic, compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $59,000.00, together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper;

   J. On the Tenth Cause of Action against Vavikova and Star Chiropractic, more than $59,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

K.    On the Eleventh Cause of Action against John Doe Defendants "1" – "10", compensatory damages in favor of Liberty Mutual in an amount to be determined at trial but in excess of $59,000.00 together with punitive damages, costs, interest, and such other and further relief as this Court deems just and proper; and

G.    For such other relief as this Court deems just and proper.

Dated: August 2, 2023
      Uniondale, New York

RIVKIN RADLER LLP

By:_____*Frank P. Tiscione*_____
      Michael A. Sirignano. Esq.
      Frank P. Tiscione, Esq.
      Ashley N. Prinz, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, Safeco Company of Indiana*